J-A31039-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| WALTER THOMAS, AS ADMINISTRATOR OF THE ESTATE OF WILLA MAE THOMAS, AND IN HIS OWN RIGHT | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | : : : | |
| v. | : : : | No. 2220 EDA 2016 |
| NATHANIEL R. EVANS, III, M.D. & JEFFERSON UNIVERSITY PHYSICIANS & THOMAS JEFFERSON UNIVERSITY HOSPITAL | : : : : : | |

Appeal from the Judgment Entered June 22, 2016
In the Court of Common Pleas of Philadelphia County
Civil Division at No(s):  May Term, 2012 No. 01003

BEFORE:   PANELLA, J., OLSON, J., and STEVENS, P.J.E.*

MEMORANDUM BY STEVENS, P.J.E.:                **FILED FEBRUARY 14, 2018**

Walter Thomas ("Appellant"), individually and as the administrator of the Estate of Willa Mae Thomas, appeals the judgment entered in the Court of Common Pleas of Philadelphia County in favor of Appellees Nathaniel R. Evans, III, M.D., Jefferson University Physicians, and Thomas Jefferson University Hospital (collectively "Appellees").  After careful review, we affirm.

The trial court set forth the following recitation of the facts:

> Willa Mae Thomas [("Decedent")] was a 68-year old woman in 2010.  In September of that year, [Decedent] started to experience symptoms, including a hoarse voice, a loss of appetite, and a feeling of a "lump" in her throat.

_____
* Former Justice specially assigned to the Superior Court.

[Decedent's] primary care physician referred her to [Appellee], Dr. Nathaniel Evans, a thoracic surgeon, after a chest X-ray and CAT scan indicated there was a mass in her chest.

Dr. Evans ordered a needle biopsy for [Decedent]. The needle biopsy was "undiagnostic" for cancer, but revealed that there was necrotic tissue in the sample. Unsatisfied with these results, and wanting more information, Dr. Evans recommended a more invasive biopsy during which he hoped to obtain a bigger tissue sample.

This procedure was performed on November 29th, 2010 by Dr. Evans. He planned to perform a procedure called Video Assisted Thorascopic Surgery ("VATS"). During this procedure, however, it became apparent both that there was more necrotic tissue in [Decedent's] lungs,[1] and that Dr. Evans would not be able to obtain a suitable tissue sample through the VATS procedure alone.

Dr. Evans therefore determined that it was appropriate to perform a wedge biopsy, a procedure where a larger tissue sample could be obtained. During this procedure, however, Dr. Evans injured [Decedent's] pulmonary artery, causing [Decedent] to hemorrhage. The injury to [Decedent's] pulmonary artery was repaired, and she remained in the hospital for approximately two and a half weeks. After she was discharged from the hospital, [Decedent] spent a week in the nursing home, and then returned to her home.

Despite the fact that during the winter months of 2011, her health appeared to be improving, on March 18, [Decedent's] condition began to deteriorate. Thomas was admitted to Abington Hospital and died on March 23, 2011.[2]

---

[1] During the surgery, Dr. Evans was able to obtain multiple biopsy samples sent to the pathology department of the hospital, where pathologists were waiting to review the samples with a microscope. Dr. John Farber, the most senior pathologist, was able to telephone Dr. Evans in the operating room to inform him that the samples contained necrotic tissue with rim of fibrosis.

[2] The parties agree Decedent's cause of death was sepsis and constriction of the pericardium, but disagree as to whether Dr. Evans's alleged deviation from

Trial Court Opinion, 4/19/17, at 1-2.

Appellant, administrator of the estate of his deceased wife, commenced this medical malpractice action against Appellees, averring that Decedent's death was caused by the negligence of Dr. Evans in choosing to perform the wedge biopsy in which Decedent's pulmonary artery sustained damage. The complaint contained counts of negligence, informed consent, and negligent infliction of emotional distress. After the trial court granted the preliminary objections and a motion for summary judgment filed by Appellees, the only claim remaining for trial was the negligence count.

Appellant filed a motion in limine to exclude use of the informed consent form and testimony as to Dr. Evans's discussion with Decedent and Appellant about the risks and complications of her proposed lung biopsy. Given that the trial court had dismissed Appellant's informed consent claim, the trial court ruled that the informed consent form was inadmissible, but indicated that Dr. Evans was permitted to offer general testimony about the possible risks and complications of the lung biopsy procedure.

The jury trial in this case commenced on January 11, 2016. At the conclusion of the two-week trial, the jury determined that Dr. Evans was not negligent and returned a verdict in favor of Appellees on January 26, 2016. On February 4, 2016, Appellant filed a Motion for Post-Trial Relief, designating a portion of the trial testimony to be transcribed. On February 16, 2016,

---

the standard of care contributed to Decedent's death. N.T. 1/12/16, at 208-10; N.T. 1/15/16, at 196-200; N.T. 1/21/16, at 94-96.

Appellees filed a response, arguing that additional portions of the trial should be transcribed at Appellant's expense. On May 10, 2016, the trial court issued an order indicating which portions of the trial record the court reporter should transcribe.

On June 22, 2016, Appellant filed a praecipe for the prothonotary to enter judgment on the jury verdict in favor of Appellees pursuant to Pa.R.C.P. 227.4(b). Appellant filed a timely appeal from this judgment. Appellant complied with the trial court's order to submit a Concise Statement of Matters Complained of on Appeal, but asked for permission to file an Amended Rule 1925(b) statement when he had received all the transcripts. On October 20, 2016, the trial court issued an order giving Appellant additional time to file the concise statement before October 31, 2016. When Appellant apprised the court that the transcripts were still not available, the trial court vacated its October 20, 2016 order and indicated that a new order requesting an Amended Rule 1925(b) statement would be filed when it was assured that all the notes of testimony had been produced.

Upon the completion of the trial transcription, on November 17, 2016, the trial court issued an order requesting that Appellant file an Amended Rule 1925(b) statement by November 28, 2016. Appellant complied with this request in filing a timely Amended Rule 1925(b) Statement. On April 19, 2017, the trial court issued an opinion pursuant to Pa.R.A.P. 1925(a).

Appellant raises the following issues for our review on appeal:

- 4 -

1. Did the trial court err as a matter of law or abuse its discretion where it permitted Dr. Evans to testify about his conversations with [Appellant and Decedent] regarding the risks of [Decedent's] lung biopsy, after the court had dismissed [Appellant's] informed consent claim on summary judgment and [Appellant's] only remaining claim at trial was for negligence?

2. Did the court err as a matter of law or abuse its discretion by precluding [Appellant] from cross-examining Dr. Evans and Dr. Evans' standard of care expert upon matters that they testified to on direct examination and which sought to discredit their credibility including:

   A. precluding the cross-examination of the credibility of Dr. Evans' testimony about his conversations with his patient regarding the risks of [Decedent's] lung biopsy using the informed consent form?

   B. precluding cross-examination of the credibility of Dr. Evans' statement that [Decedent] "showed no signs of infection during the recovery period [at Thomas Jefferson University Hospital]?"

   C. precluding cross-examination of Dr. Evans regarding whether he could have consulted more experienced physicians when he confronted a thick, unusual tissue and chain of lymph nodes even though Dr. Evans testified about other times during [Decedent's] case where he consulted with more experienced physicians?

   D. precluding the cross-examination of Dr. Detterback's statement that [Decedent] had an "at least 99 percent of cancer" after the court denied [Appellant's] motion *In Limine* which sought to preclude this precise testimony?

3. Did the court err as a matter of law or abuse its discretion where it denied [Appellant's] Motion *In Limine* To Preclude Certain Testimony of [Dr. Evans's] standard of care expert and permitted him to testify that no objective standard of care controlled Dr. Evans' surgical decisions and conduct, but rather the surgical conduct was left entirely up to Dr. Evans' own subjective judgment?

4. Did the court err as a matter of law or abuse its discretion where it refused to grant [Appellant's] motion to preclude Dr. Farber, the treating pathologist, from offering expert opinions as to the cause of the necrosis and fibrosis found in [Decedent's] pathology which were not disclosed to [Appellant] in advance of trial?

Appellant's Brief, at 2-3 (reordered for review).

As an initial matter, we note that Appellant requested a new trial in his Motion for Post-Trial Relief based on the trial court's alleged abuse of discretion in evidentiary rulings. Although Appellant sought this relief from the trial court, Appellant filed a *praecipe* for the entry of judgment pursuant to Pa.R.C.P. 227.4 before the trial court ruled on the motion. Rule 227.4(1)(b) permits any party to an action to praecipe the prothonotary for entry of judgment if

one or more timely post-trial motions are filed and the court does not enter an order disposing of all motions within one hundred twenty days after the filing of the first motion. A judgment entered pursuant to this subparagraph shall be final as to all parties and all issues and shall not be subject to reconsideration.

Pa.R.C.P. § 227.4(1)(b).[3] "The intent of this rule is to give all parties the option of moving the case forward if there is a delay in the trial court's ruling

---

[3] We also note that the trial court was required to file a responsive Rule 1925(b) opinion despite its loss of jurisdiction to decide the Motion for Post Trial Relief. This Court has provided that:

there is nothing contained in Pa.R.C.P. 227.4 which relieves a trial court of responsibility for writing an opinion on the legal merits of the issues presented by the parties for review. Pa.R.A.P.1925. While a trial court in this situation is powerless to act by entry of an order, the court is required to write an opinion on the legal merits of the issues and to suggest what relief it would

on post-trial motions. The parties have the right to not exercise this option."
***Hartner v. Home Depot USA, Inc.***, 836 A.2d 924, 927 (Pa.Super. 2003)
(citing Pa.R.C.P. 227.4, Explanatory Comment-1995, § I(a)). In such cases
where a party enters judgment pursuant to Rule 227.4, we may deem motions
for a new trial to be denied. ***Angelo v. Diamontoni***, 871 A.2d 1276, 1279
(Pa.Super. 2005).

Appellant challenges the lower court's denial of his Motion for Post-Trial
Relief, in which he requested a new trial. "[W]hen reviewing the denial of
a motion for new trial, we must determine if the trial court committed
an abuse of discretion or error of law that controlled the outcome of the
case." ***Fletcher–Harlee Corp. v. Szymanski****,* 936 A.2d 87, 93 (Pa.Super.
2007) (citation omitted). All of Appellant's issues challenge the trial court's
discretion in ruling on evidentiary issues.

> The admission or exclusion of evidence, including the admission
> of testimony from an expert witness, is within the sound discretion
> of the trial court. Thus, our standard of review is very narrow; we
> may only reverse upon a showing that the trial court clearly
> abused its discretion or committed an error of law. To constitute
> reversible error, an evidentiary ruling must not only be erroneous,
> but also harmful or prejudicial to the complaining party.

***Crespo v. Hughes***, 167 A.3d 168, 181 (Pa.Super. 2017) (citations omitted).

---

have granted had it been able to take such action in a timely
fashion.

***K-B Bldg., Co. v. Hermara Assocs., Inc.***, 709 A.2d 918, 919 (Pa.Super.
1998).

- 7 -

First, Appellant argues that the trial court abused its discretion in allowing Dr. Evans to testify as to his conversations with Decedent and Appellant about the risks and complications associated with the lung biopsy scheduled for November 29, 2010. Appellant contends that, as the trial court had previously dismissed his informed consent claim and his only remaining claim was for negligence, any testimony related to Dr. Evans' discussion of the risks of the lung biopsy with Decedent was irrelevant to the issue of whether Dr. Evans was negligent in performing the procedure. Moreover, Appellant argues that Dr. Evans's testimony was unfairly prejudicial as it allowed the jury to determine that Decedent's consent to undergo the surgery was the same as her consent to all the risks and complications even if the surgery was performed negligently.

In response, Appellees argue that Appellant opened the door to the admission of this informed consent evidence by introducing testimony that would cause the jury to infer that Decedent did not provide informed consent to the wedge biopsy. Appellees also argue that Dr. Evans's testimony was relevant to the standard of care as it went directly to his state of mind and his appreciation for the risk of injury to Decedent's pulmonary artery.

Our rules of evidence provide that evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Pa.R.E. 401. "All relevant evidence is admissible, except as otherwise provided by law." Pa.R.E. 402. Even if the evidence is

relevant, the evidence may be still excluded if "its probative value is outweighed by the danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Pa.R.E. 403.

In **Brady v. Urbas**, 631 Pa. 329, 111 A.3d 1155 (2015), a similar case in which the plaintiff sought relief on a medical negligence claim and did not raise an informed consent claim, our Supreme Court discussed the admissibility of evidence of known risks and complications of treatment as follows:

> To prevail on a claim of medical negligence, the plaintiff must prove that the defendant's treatment fell below the appropriate standard of care.  We therefore consider whether informed-consent evidence is probative of that question.  In undertaking this inquiry, it is important to recognize that such information is multifaceted: it reflects the doctor's awareness of possible complications, the fact that the doctor discussed them with the patient, and the patient's decision to go forward with treatment notwithstanding the risks.

> Some of this information may be relevant to the question of negligence if, for example, the standard of care requires that the doctor discuss certain risks with the patient.  Evidence about the risks of surgical procedures, in the form of either testimony or a list of such risks as they appear on an informed-consent sheet, may also be relevant in establishing the standard of care.  In this regard, we note that the threshold for relevance is low due to the liberal "*any* tendency" prerequisite.  Pa.R.E. 401.  **Accordingly, we decline ... to hold that all aspects of informed-consent information are always irrelevant in a medical malpractice case.**

> Still, the fact that a patient may have agreed to a procedure in light of the known risks does not make it more or less probable that the physician was negligent in either considering the patient an appropriate candidate for the operation or in performing it in

the post-consent timeframe. Put differently, there is no assumption-of-the-risk defense available to a defendant physician which would vitiate his duty to provide treatment according to the ordinary standard of care. The patient's actual, affirmative consent, therefore, is irrelevant to the question of negligence. Moreover, … assent to treatment does not amount to consent to negligence, regardless of the enumerated risks and complications of which the patient was made aware. That being the case, in a trial on a malpractice complaint that only asserts negligence, and not lack of informed consent, evidence that a patient agreed to go forward with the operation in spite of the risks of which she was informed is irrelevant and should be excluded.

*Brady*, 631 Pa. at 339–42, 111 A.3d at 1161–63 (emphasis added, citations, footnotes, and some quotation marks omitted).

However, consistent with its refusal to hold that all aspects of informed-consent information are always irrelevant in a medical malpractice case, the Supreme Court expressly indicated in *Brady* that it did not intend to preclude a plaintiff from using such informed consent evidence for impeachment purposes "if the plaintiff adduces evidence that she did not consent to a particular risk." *Id*. at 342, 111 A.3d at 1163 n. 8.

In this case, despite the trial court's pretrial ruling that testimony with respect to the Decedent's informed consent was inadmissible, Appellant's counsel emphasized in his opening statement that Decedent did not want to undergo surgery but only agreed to go forward with the lung biopsy only after being assured by Dr. Evans that it would be a routine, minimally invasive surgery. Counsel's opening statement included the following statement:

[Decedent and Appellant] went for a follow-up visit with Dr. Evans on November 4, 2010. Unfortunately all of that happiness that they had over the good biopsy results dissipated because Dr. Evans said, no, I still think it's cancer, and we need to do an

operation. I need to take you to surgery and I need to get a bigger and better tissue sample so that we can find this out for sure.

You are going to find out [Decedent] did not want to have surgery. She didn't understand why since she already had a biopsy and it wasn't cancer, why she needed surgery. She was afraid. She was afraid of getting cut up. She didn't want scars on her body, but Dr. Evans and her husband and her daughter based on what Dr. Evans had said convinced her this was something she really needed to do, and so [Decedent] went to surgery by Dr. Evans on November 29th, 2010, and the additional assurance that [Decedent] had received was this wasn't going to be a big operation. Dr. Evans was going to do what's known as a minimally invasive surgery.

\*\*\*

Dr. Evans had told [Decedent] and [Appellant] that he was going to do minimally invasive surgery. You heard a little bit about it in the jury selection, what is called a VATS surgery, and that is an acronym for Video Assisted Thorascopic Surgery …. For my purposes it is a scope, and essentially Dr. Evans is in the operating room, and with one eye is he looking through the scope through incisions that had been placed into [Decedent's] body. It is a two-dimensional view of everything in her chest like you would have if you do an open surgery.

And so [Decedent] was told, convinced that this was going to be a minimally invasive surgery. It wasn't going to take long, not longer than maybe an hour, a hour-and-a-half, as much as two hours. She probably wouldn't have to stay in the hospital overnight and then she would go home and she would be fine. We could have a diagnosis and then we would proceed.

Notes of Testimony (N.T.), 1/12/16, at 33-35.

Appellant continued to highlight the issue of Decedent's consent to the surgery by repeatedly testifying on direct-examination that Decedent did not want to have the biopsy but eventually agreed to have the procedure after Dr. Evans told her it was a minor, routine procedure that "was no big deal." N.T., 1/14/16, at 41-42.

[Appellant's counsel]: Now, in that visit with Dr. Evans following the biopsy on November 4, 2010, did you go with your wife there?

[Appellant:] Yes, I did.

[Appellant's counsel]: And do you remember that conversation with Dr. Evans on November 4th?

[Appellant:] Yes, I did.

[Appellant's counsel]: Can you please tell us what happened at that visit with Dr. Evans?

[Appellant:] We went into Dr. Evans' office and he – first he told us that she needed another biopsy, and my wife didn't want to take it, didn't want a biopsy. He didn't insist, but he ensured us that she needed that to find out what was wrong with her. Me and her really didn't want to do that, but we had came too far and he ensured us that taking the biopsy, it was a chance of him finding out what the dark mass was in her chest.

[Appellant's counsel]: Did he tell you that [Decedent] needed to go and have surgery for his biopsy?

[Appellant:] Yes he did. That was the part that she really didn't want to do because he was going to cut her and she was very upset about it, but he ensured her that he was only going to put very small incisions in her skin and put some items in there to see and take the biopsy. She really didn't want to do it, but he insisted that we had to do it because that's the only way to get a big enough sample to get a biopsy. He ensured us that he would do that and take care of her.

[Appellant's counsel]: The way the biopsy surgery was presented to you and your wife by Dr. Evans, did it seem like it was going to be any type of a major operation or big deal?

[Appellant:] No, it didn't. He described it to us, a small incision that would maybe take two stitches on the sewing up and it wouldn't leave no big scars or anything, and it was basically a routine type thing, and it wasn't no big deal. She would either go home that evening or maybe spend the night in the hospital that night and go home the next day. So we kind of did a quick talk over and we didn't want to do it, but I talked her into doing it.

- 12 -

[Appellant's counsel]: Did Dr. Evans tell you how long the surgery would take?

[Appellant:] Approximately a couple of hours.

[Appellant's counsel]: Did you and your wife trust Dr. Evans?

[Appellant:] Yes, I trusted him. Because he said – I asked him was he going to do the surgery. He said I am going to do it with my own hands and I am going to take care of your wife, and I entrusted my wife with him.

N.T., 1/14/16, at 41-42.

Moreover, Appellant's counsel delivered a narrative to the jury, accusing Dr. Evans of being an inexperienced surgeon who did not foresee the risks associated with a wedge biopsy and foolishly pursued this course of action. In her opening statement, Appellant's counsel stated:

[Decedent] was losing blood so fast that anesthesia couldn't keep up with her. They couldn't get enough blood product fast enough into her to keep her sustaining life. Fortunately she was at Thomas Jefferson University Hospital where there were other more experienced surgeons available to come in and help Dr. Evans. More experienced surgeons that he could have called upon before he decided to do his wedge biopsy, but he didn't.

You will find out that Dr. Evans had completed his residency, his physician in training in thoracic surgery in February, 2010, just seven months before [Decedent's] surgery. He was only an attending physician for that seven months having primary responsibility for his patients.

… So the surgeons came in and did what needed to be done under this emergency situation that all could have been avoided.

N.T., 1/12/16, at 42-43.

Thereafter, upon direct examination of Dr. Evans by his counsel, Dr. Evans clarified that he informed Decedent of the possible risks and

complications of the lung biopsy that he had thoroughly contemplated before recommending this course of action.

> [Defense counsel:] Dr. Evans, did you have a conversation with [Appellant] and [Decedent] about the risks that could be associated with surgery that you were proposing to perform on November 29th?
>
> [Dr. Evans:] Certainly, yes.
>
> [Defense counsel:] And could you discuss that with the jury, please?
>
> [Dr. Evans:] Well, I had the same discussion I have with every patient I ever do chest surgery on. I explained to them that what I expect the course of the operation to be and the potential risks that are associated, especially in a case like this where we're doing a thoracoscopy. That I tell them there is always a small chance I will have to make a bigger incision and there are multiple reasons why that may happen. It doesn't happen very often, but it does happen, and I tell them that every operation there is a small chance of death during or around the time of the operation. It's extremely unlikely but it does happen. I typically will given them my estimation of the percentage of that happening for their operation. So with an operation like here I would have said there is a 1 to 2 percent chance of your having a life-threatening complication during this operation.

N.T, 1/15/16, at 131-32.

In light of Appellant's emphasis that Decedent had allegedly only consented to a minor, routine, and minimally-invasive surgery and his suggestion that Decedent was never advised of the potential for the life-threatening consequences that ultimately ensued, it was not an abuse of discretion for the trial court to allow Dr. Evans to briefly state that he had advised Decedent of the risks associated with the biopsy to impeach Appellant's suggestion to the contrary. We reiterate that the Supreme Court

in **Brady** expressly stated that its decision in no way precluded a plaintiff from using informed consent evidence for impeachment purposes "if the plaintiff adduces evidence that she did not consent to a particular risk." **Id**. at 342, 111 A.3d at 1163 n. 8. Other than Dr. Evans's isolated statement contradicting Appellant's suggestion that Dr. Evans had not advised Decedent of the potential risks and complications of the surgery, the defense did not pursue any further questioning with respect to Decedent's consent to the procedure. Accordingly, the trial court did not abuse its discretion in allowing Appellees latitude to present this limited testimony to rebut Appellant's suggestion that Decedent did not consent to the risks posed by the biopsy.

In Appellant's second issue, he argues that the trial court improperly limited his ability to properly cross-examine defense witnesses, Dr. Evans and Dr. Frank Detterback, the defense expert on standard of care. It is well established that "[t]he scope of cross-examination is within the sound discretion of the trial court, and we will not reverse the trial court's exercise of discretion in absence of an abuse of that discretion." **Yacoub v. Lehigh Valley Med. Assocs., P.C.**, 805 A.2d 579, 592–93 (Pa.Super. 2002) (citation omitted). "[I]n setting limits on cross-examination, the trial court may consider whether the cross-examination would be likely to confuse or mislead the jury. As with any other type of evidence, to be admissible, it must be relevant and also not unfairly prejudicial. **Id**. (citing Pa.R.E. 403).

Appellant's claim with respect to Dr. Evans is three-fold: Appellant claims that he was prevented from cross-examining Dr. Evans (1) in using the

- 15 -

informed consent form to impeach his credibility, (2) in questioning his claim that Decedent showed no sign of infection, and (3) in asking whether Dr. Evans could have consulted more experienced physicians before pursuing the wedge biopsy.

The trial court correctly precluded Appellant's counsel from employing the November 4, 2010 consent form in his cross-examination of Dr. Evans as this document was irrelevant to Appellant's negligence claim.  As discussed above, the Supreme Court in **Brady** affirmed the award of a new trial to the appellee patient as the defendant physician was permitted to admit consent forms into evidence and question appellee extensively as to her consent.  The Supreme Court reasoned that introduction of this evidence led to a substantial possibility that the jury relied on an improper consideration in reaching its verdict, that is the jury may have determined that the patient's consent to the procedure implied consent to the resultant injury.

In this case, Appellant himself had successfully moved to preclude the admission of this document in his pretrial motion on the very basis set forth in **Brady**.  Accordingly, we find the lower court did not abuse its discretion in refusing to allow Appellant to introduce the consent form, which would likely have only served to confuse the jury and allow it to find liability on an improper basis.

Appellant also claims that the trial court restricted him from cross-examining Dr. Evans as to his claim that Decedent did not show any signs of infection upon her discharge from Thomas Jefferson.  Our review of the record

- 16 -

reveals that Appellant's counsel did cross-examine Dr. Evans with respect to a finding of haemophilus influenza on Decedent's bronchoscopy. Appellant's counsel also presented Dr. Evans with the fact that Decedent had elevated white blood cell counts during her hospitalization, which Dr. Evans agreed could be a sign of infection. Thus, Appellant's counsel was able to question Dr. Evans's assertion that there were no signs of infection at Thomas Jefferson.

The trial court did prevent Appellant's counsel from further emphasizing the finding of an elevated white blood cell count, as Appellant was attempting to introduce a new theory of causation at trial, specifically that Dr. Evans had missed an infection while Decedent was hospitalized at Thomas Jefferson, which worsened and led to her death several months later.[4] As Appellant had not properly presented a theory of liability based on Dr. Evans's failure to

_____

[4] Appellant's initial theory was that Decedent developed an infection during her subsequent admission to Abington Memorial Hospital in March 2011 as she was so debilitated from her hospitalization at Thomas Jefferson several months earlier in late November – December 2010. Appellant's complaint in this case centered on Dr. Evans' alleged negligence in choosing his surgical technique and in pursuing the wedge biopsy.

Just weeks before trial was to commence, Appellant attempted to assert for the first time that Dr. Evans was negligent in failing to diagnose and treat an infection while Decedent was still a patient at Thomas Jefferson. Appellant also identified Dr. Kevin G. Mennitt, M.D., as a new expert. Thereafter, Appellees filed a motion *in limine* arguing that Appellant could not advance a new theory of liability at this point as the request was untimely and involved the allegations of postsurgical breaches in the standard of care of Dr. Evans and other non-party physicians. Following oral argument, the trial court granted Appellee's motion and precluded Dr. Mennitt from testifying at trial.

diagnose an infection at Thomas Jefferson, the trial court properly exercised its discretion to appropriately preclude further questioning that would suggest that the jury could find liability on an improper basis.

Moreover, we reject Appellant's claim that his counsel was improperly precluded from questioning Dr. Evans upon whether he should have sought assistance from "more experienced surgeons" when he decided to further pursue the wedge biopsy in attempting to dissect Decedent's lymph nodes from her pulmonary artery. This line of questioning suggested a new theory of liability that Dr. Evans was negligent in failing to consult with other surgeons in the midst of the wedge biopsy. Moreover, the question implied that Dr. Evans lacked the training or experience to perform this portion of the biopsy.

The issue of whether Dr. Evans was negligent in failing to consult with other surgeons during the operation is a matter requiring expert testimony, as it is not within the ordinary knowledge of laypersons. Appellant's liability expert, Dr. Michael Greene, did not opine that Dr. Evans deviated from the standard of care in proceeding with the wedge biopsy without consulting with other surgeons. *See **Toogood v. Owen J. Rogal, D.D.S., P.C.,*** 573 Pa. 245, 255, 824 A.2d 1140, 1145 (2003) (emphasizing that "because the negligence of a physician encompasses matters not within the ordinary knowledge and experience of laypersons a medical malpractice plaintiff must present expert testimony to establish the applicable standard of care, the deviation from that standard, causation and the extent of the injury"). Therefore, we conclude that the trial court did not err in limiting this line of questioning.

Appellant also argues that the trial court improperly limited his ability to cross-examine Dr. Detterbeck, the defense's standard of care expert. Dr. Detterback, who serves as a professor and Chief of Thoracic Surgery at Yale University School of Medicine, reviewed Decedent's medical records and testing results and opined that [Decedent] had "at least 99 percent chance" that the mass in Decedent's lung was malignant cancer. N.T. 1/20/16, at 34.

Appellant does not challenge the admission of this particular testimony but argues that he was prevented from cross-examining Dr. Detterbeck with respect to whether that Dr. Evans should have sought additional blood tests or other studies to conclusively determine that Decedent had cancer or whether Dr. Evans should have referred Decedent to an oncologist before performing the thorascopic biopsy. As these matters are likewise outside the ordinary knowledge of laypersons, Appellant was first required to establish with expert testimony that Dr. Evans's failure to take these steps was a deviation from the standard of care. Appellant's own expert, Dr. Greene, did not testify or opine that Dr. Evans deviated from the standard of care in failing to order additional tests or studies or in referring Decedent to an oncologist before proceeding with the biopsy. As such, the trial court properly limited Appellant from suggesting that Dr. Evans was negligent in these omissions without first establishing that the standard of care required these steps.

In his third claim of error, Appellant argues that the trial court erred in denying his motion in limine and permitting Dr. Evans's standard of care expert, Dr. Detterback to allegedly testify that Dr. Evans was not subject to

an objective standard of care in deciding to proceed with the wedge biopsy after observing that Decedent's lymph nodes were stuck together and needed to be separated. Instead, Appellant argues that Dr. Detterback improperly suggested that the decision to proceed with the surgery should have been guided under a solely subjective standard and left to Dr. Evans's own judgment.

When we review the record as a whole, we find that Appellant is taking Dr. Detterback's expert opinion and testimony out of context. Initially, we note that Appellant's expert, Dr.Greene, first testified that it was improper for Dr. Evans to proceed with the wedge biopsy after determining that the VATS procedure revealed more necrotic tissue in Decedent's lungs, but did not allow Dr. Evans to obtain a suitable tissue sample. Dr. Greene suggested that Dr. Evans's decision to perform the wedge biopsy did not fall within the standard of care as it required him to separate the lymph nodes where were very close to the pulmonary artery. Dr. Greene specifically opined that it would not be prudent for a surgeon to commence any biopsy that would "put tension or jeopardize the pulmonary artery." N.T., 1/12/18, at 154-55.

In response, Dr. Evans presented the testimony of Dr. Detterback, who opined that Dr. Evans acted appropriately within the standard of care in choosing to proceed with a wedge biopsy after determining that the mass of necrotic tissue in Decedent's lung was likely cancer. Dr. Detterback felt that Dr. Evans' attempt to obtain a more suitable tissue sample was an appropriate

choice as doctors would need to identify the type of Decedent's tumor to best define the treatment plan that Decedent would need.

[Defense counsel:] [W]as there any deviation from the standard of care by Dr. Evans in his decision making with respect to dissecting lymph nodes in an attempt to complete the wedge resection?

[Dr. Detterback:] I don't know think that deviates from the standard of care. I do think it's a, you know, judgment call of, you know, what appears to be feasible to do, and I think you have to try to do this carefully and see how this goes, but if it appears that freeing up those lymph nodes is going to make you be able to complete the wedge resection, then I certainly would have proceeded in that fashion.

[Defense counsel:] And is that something that surgeons --- thoracic surgeons like yourself … have been through programs are trained to do every day?

[Dr. Detterback:] Yes, that's certainly, what we do everyday.

[Defense counsel:] Now, notwithstanding the exercise of appropriate care in the dissection of lymph nodes, is there not involved a risk of injury to the pulmonary artery on those branches?

[Dr. Detterback:] Well, certainly. I mean, there is clearly an element of risk with surgery, and there is clearly an element of risk with thoracic surgery, and I think that the pulmonary artery is probably the thing we respect the most. You know, overall it's the instance of major bleeding which is typically from the pulmonary artery is 1 percent in thoracic operations, and interestingly it's about 1 percent whether it's a VATS case or an open case, but clearly there is an element of risk that's there, and I think that any thoracic surgeron that has been significantly in practice has encountered this situation at times. So you can't say that it can't happen. It certainly does.

[Defense counsel:] And when it does happened and when it's happened to you, has it happened notwithstanding appropriate care, appropriate decision making, and careful dissection?

[Dr. Detterback:] Well, yes. It certainly has happened to me and it's happened despite trying to be very careful and thoughtful and trying not to have that happened.

N.T, 1/20/16, at 51-52.

Dr. Detterback rejected Dr. Greene's statement that the standard of care always requires a surgeon to abandon any attempt to perform a biopsy near the lymph nodes. Instead, Dr. Detterback explained that Dr. Evans's choice to continue with the wedge biopsy which was also an accepted course of treatment if the surgeon proceeded with reasonable caution based on his intraoperative findings:

> [Defense counsel:] If I could, and that is when Dr. Evans encountered lymph nodes which precluded him from completing the wedge resection, do you have an opinion as to whether the standard of care required Dr. Evans to abandon or abort the wedge resection when he encountered the lymph nodes that he could not staple through?
>
> [Dr. Detterback:] Well, I do not think there is a standard of care that would say that you have to abandon VATS or you have to do this or that. I think that many --- it's a judgment call as to what the situation is like and what you can do and what you can do safely. But you know, dissecting lymph nodes off of the pulmonary artery is something that, you know, I do day in and day out, every thoracic surgeon does day in and day out when you resect lung cancer. That's part of what you do, and you see how that goes and you dissect them off. Can there be situations where it's more difficult or situations where it's easier, certainly. Do you have to exercise some judgment, yes. But can we, you know, -- I mean in retrospect you can say all sorts of things, but I don't think that you can say there is a standard of care that requires one or the other. I think it's a judgment call based on how things seem to set up and what is feasible.

N.T, 1/20/16, at 48-49. As a result, Dr. Detterback asserted that the objective standard of care requires a physician to exercise reasonable care in the treatment of his or her patients.

Our courts have recognized a "two schools of thought" doctrine which holds that a physician will not be liable for choosing, in the exercise of her or his judgment, one of two or more *accepted* courses of treatment where *competent* medical authority is divided as to the proper course. ***Passarello v. Grumbine***, 624 Pa. 564, 585, 87 A.3d 285, 297 (2014) (citations omitted). Thus, the parties' disagreement as to whether Dr. Evans's decision to proceed with the wedge biopsy violated his standard of care is not a question of admissibility, but concerns the weight of the evidence. The parties were free to contest each theory through cross-examination and leave the ultimate credibility determination to the factfinder.[5] We thus find this claim to be without merit.

In his last claim of error, Appellant argues that the trial court abused its discretion in denying his motion to preclude Dr. John Farber, the treating

---

[5] Appellant's sole citation to ***Pringle v. Rapaport***, 980 A.2d 159, 170, (Pa.Super. 2009) is unavailing as it does not concern the admissibility of an expert's opinion but focuses exclusively on the propriety of the trial court's instruction to the jury. The ***Pringle*** Court held that a jury must be charged that a defendant-physician must be judged by an objective standard of care and that trial courts should not give "error in judgment" jury instruction which has a substantial risk of confusing the jury as to the standard of care. Appellant does not challenge the jury instructions in this case and the trial court properly charged the jury that Dr. Evans must be held to an objective standard of care.

pathologist who analyzed the lung biopsy samples that Dr. Evans sent to the pathology department during Decedent's November 29, 2010 surgery, from offering expert testimony as to the cause of necrosis and fibrosis in Decedent's lung and chest. Appellant argues that Dr. Evans failed to properly disclose this expert testimony in advance of trial pursuant to Pa.R.C.P. 4003.5 (requiring pre-trial identification of experts and disclosure of expert reports "acquired or developed in anticipation of litigation or for trial").

By way of background, we note that Appellant's expert witnesses used Dr. Farber's pathology report to support their opinions that Decedent did not have cancer. For example, Dr. Carl Schoenberger, a physician specializing in pulmonary medicine, testified that Dr. Farber's pathology report "proved definitively" that Decedent did not have cancer as none of the samples showed any evidence of malignancy. N.T. 1/13/16, at 182, 204-207. Although the pathology report did not identify the cause of the necrosis in Decedent's chest, Dr. Schoenberger opined that the pathologist had diagnosed Decedent with fibrosing mediastinitis (a benign disease). *Id*. at 206. Likewise, Dr. Greene interpreted Dr. Farber's report to conclude that Decedent's abnormal tissue was "consistent with fibrosis and necrosis and no cancer." N.T. 1/11/16, at 152-53.

Thereafter, the defense called Dr. Farber as a fact witness to testify as to his findings and conclusions made in preparing his pathology report and to rebut the testimony of Dr. Schoenberger and Dr. Greene. Appellant made an oral motion to preclude Dr. Farber from offering expert opinions, accusing the

defense of failing to identify Dr. Farber as an expert witness prior to trial. Defense counsel argued that Dr. Farber was a fact witness that was known to Appellant since the beginning of the case as the treating pathologist who authored the pathology report and Appellant had every opportunity to depose Dr. Farber. Defense counsel advised the court that the jury should hear from Dr. Farber as to what his findings and conclusions were from his pathology report to contest the interpretation of the report by defense experts. The trial court decided to allow Dr. Farber to testify but indicated he would rule on the motion on a question-by-question basis.

Dr. Farber worked with Dr. Evans during Decedent's November 29, 2010 surgery to analyze the cause of the mass in Decedent's lung. Based on the seventeen tissue samples that Dr. Evans provided to the pathology lab that day, Dr. Farber testified that he found necrotic tissue in four areas: the anterior mediastinum, the pericardium, the chest wall, and the lung. Thereafter, Dr. Farber opined that there are "very, very few" disease processes that will cause necrosis in all four areas and stated that these findings "reduce[d] what this could be all about to virtually one thing… cancer." N.T. 1/22/16, at 112-13. Appellant's counsel made an immediate objection, which the trial court sustained.

In evaluating whether a fact witness has properly given expert testimony, this Court has held the following:

> Technical expertise does not *ipso facto* convert a fact witness, who might explain how data was gathered, into an expert witness, who

renders an opinion based on the data." ***Branham v. Rohm & Haas Co.,*** 19 A.3d 1094, 1110 (Pa.Super.2011).

> A pre-trial report by a non-party expert serves to inform the opposing side of the identity of a party's experts and the conclusions of the experts in order to prevent unfair surprise and prejudice at trial. However, a physician who is also a defendant may testify as a fact witness in his own behalf without the prior filing of an expert's report.
>
> ***Havasy v. Resnick***, 415 Pa.Super. 480, 609 A.2d 1326, 1333 (1992). "Fact testimony may include opinion or inferences so long as those opinions or inferences are rationally based on the witness's perceptions and helpful to a clear understanding of his or her testimony." ***Brady by Brady v. Ballay***, 704 A.2d 1076, 1082 (Pa.Super.1997).

***Deeds v. Univ. of Pennsylvania Med. Ctr.***, 110 A.3d 1009, 1017–18 (Pa.Super. 2015).

In this case, Dr. Farber was asked to clarify his specific findings on a pathology report he made at the time that Dr. Evans was conducting the wedge biopsy as part of Decedent's treatment. Dr. Farber's opinions were formulated in the course of his duties in his capacity as the senior pathologist at Thomas Jefferson. As Dr. Farber's opinions were not developed in anticipation of litigation, Rule 4003.5 does not apply. ***See Miller v. Brass Rail Tavern***, 541 Pa. 474, 664 A.2d 525, 531–32 (1995) (noting that the rule of preclusion for failing to identify experts pursuant to Rule 4003.5 applies only where the expert opinions were formulated "in anticipation of litigation or for trial").

Further, Dr. Farber was qualified to comment as a fact witness on causation as his opinion was rationally based on his perceptions and diagnosis

at the time he rendered his pathology testing on Decedent's tissue for her treatment. Dr. Farber's testimony was helpful to the jury's clear understanding of the pathology report, which had been interpreted differently by Appellant's expert witnesses. *See also Crespo*, 167 A.3d at 182 (finding physician "qualified to comment as a fact witness on causation because his testimony was based on his observations, diagnosis, and medical judgment at the time he rendered treatment to the appellee). Thus, we discern no abuse of the trial court's discretion.

For the foregoing reasons, we affirm the judgment entered in favor of Appellees.

Judgment affirmed. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>2/14/18</u>