J-A25017-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| SHANTE JACKSON | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| v. | : | |
| | : | |
| LIVE! CASINO AND HOTEL | : | |
| PHILADELPHIA AND STADIUM | : | |
| CASINO RE, LLC D/B/A LIVE! | : | |
| CASINO AND HOTEL PHILADELPHIA, | : | |
| DARRELL H. LOWRY, AND NASHA M. | : | |
| EDWARDS | : | |
| | : | |
| APPEAL OF: LIVE! CASINO AND | : | |
| HOTEL PHILADELPHIA AND STADIUM | : | No. 2792 EDA 2024 |
| CASINO RE, LLC D/B/A LIVE! | : | |
| CASINO AND HOTEL PHILADELPHIA | : | |

Appeal from the Judgment Entered October 2, 2024
In the Court of Common Pleas of Philadelphia County
Civil Division at No(s): 220502296

BEFORE: BOWES, J., KING, J., and FORD ELLIOTT, P.J.E.[*]

MEMORANDUM BY BOWES, J.:         **FILED FEBRUARY 24, 2026**

Live! Casino and Hotel Philadelphia and Stadium Casino RE, LLC d/b/a Live! Casino and Hotel Philadelphia (collectively "Defendant") appeal from the $3,071,958.90 judgment entered in favor of Shante Jackson ("Plaintiff") after a jury found in her favor on her negligence claim. We affirm.

We glean the following history of the case from the certified record. At approximately 9:30 p.m. on April 17, 2022, Plaintiff met her cousin at Defendant's casino to celebrate Plaintiff's birthday. Plaintiff and her cousin

_____

[*] Retired Senior Judge assigned to the Superior Court.

had dinner at a casino restaurant, then spent a few hours at one of its bars listening to live music. Deciding to head home just shy of 2:30 a.m., the women stopped at a restroom on the way out. Therein, the cousins encountered a highly-intoxicated woman dressed in pink, later determined to be Natasha Edwards, who slurred the word "boo" at them a couple of times before aggressively approaching Plaintiff.[1] Plaintiff's cousin attempted to intercede, but Edwards reached over her and yanked Plaintiff's hair. Edwards proceeded to pull out Plaintiff's hair and strike her in the face, while two other women in the bathroom joined the attack, knocking Plaintiff down. The assault continued as Plaintiff curled up on the urine-covered floor trying to defend herself from the women's punches and kicks and Plaintiff's cousin tried to protect her and her keep her pocketbook from being stolen. A man subsequently identified as Darrell Lowry entered the restroom to join the fracas before casino janitors heard the commotion, intervened, and summoned security.

The assailants were detained before being allowed to leave the casino. Staff provided a bandana for Plaintiff to cover her head while they escorted her through the casino floor to the exit. Security had Plaintiff wait while the assailants and their entourage exited the parking garage. She drove home and washed herself before going to the emergency room. There, in addition

_____

[1] The boos were not the type designed to scare or startle the hearer, but the sort used to express dissatisfaction, as with a sports fan booing a team.

to the loss of her hair and a black eye, Plaintiff was diagnosed with having fractures to her nose and orbital bones, as well as spinal injuries. Plaintiff did not require surgical intervention, but the physical and emotional harm had an ongoing impact, including continuing neck and back pain, along with feelings of fear and discomfort when leaving the safety of her home.

For two days after the attack, Plaintiff called the casino asking to speak to Defendant's head of security about the incident. She eventually received a call back two or three days later advising her to return to the casino to write a statement, which she declined to do. Plaintiff promptly consulted an attorney who, on May 10, 2022, provided Defendant notice to preserve, *inter alia*, all surveillance footage of the time surrounding the incident, specifically from the afternoon of April 16, 2022, to noon on April 17, 2022. Defendant produced some videos that it had preserved depicting people involved in the assault close in time to it. However, Defendant was unable to produce footage which would have established what time the assailants arrived at the casino, their activities within the casino before they attacked Plaintiff, and images of Plaintiff's condition as she was escorted out, as it had been overwritten after fourteen days pursuant to its policies.

Plaintiff commenced the instant action by complaint filed on May 25, 2022. After rounds of preliminary objections and amended pleadings, Defendant filed an answer and new matter. In September 2022, Defendant joined Lowry and Edwards as additional defendants, alleging that they were

negligent in attacking Plaintiff and causing her physical and mental harm, and were either solely liable to Plaintiff or liable over to Defendant. Although neither Lowry nor Edwards filed an answer or otherwise defended the case, no default judgment was sought or entered against them.

Defendant filed motions *in limine* as trial approached. Pertinent to this appeal, Defendant sought to preclude Plaintiff from offering testimony or other evidence that Edwards exhibited signs of intoxication such as smelling of alcohol and slurring her speech. It maintained that there was no indication that Defendant served alcohol to Edwards, that she consumed any alcohol, or what her blood alcohol level had been at the time in question, and further that intoxication was not relevant to Plaintiff's negligence claim. The trial court denied the motion.

At the ensuing jury trial, Plaintiff testified to her experiences, including her feelings of terror and degradation during the attack and her embarrassment and humiliation as Defendant's personnel walked her, swollen, bloodied, hairless, and covered in urine, through the casino to the exit while "everyone" was looking at her. *See* N.T. Trial, 12/18/23, at 118. Plaintiff also discussed the extent of her injuries, her treatment, and her lingering symptoms.

The jury viewed the deposition of Mark Allen, M.D., who attested to Plaintiff's injuries resulting from the attack, which included closed head trauma; fracture of the nasal bones; sprains and strains of the cervical,

thoracic, and lumbar spine; and multiple disc herniations. Dr. Allen further explained that Plaintiff underwent chiropractic treatments and physical therapy and was discharged after achieving maximum medical improvement. Overall, his prognosis was guarded, with her spinal injuries not expected to resolve, but to worsen as she ages.

Plaintiff also called two of Defendant's employees to give evidence in her case-in-chief: Sean McKenna, the security director at the time of the incident, and William Shreckengost, the director of surveillance.

Mr. McKenna explained that security and surveillance were separate departments within Defendant's organization. The surveillance department was "like a secret society" that was not supposed to have "interactions with the rank and file of the other departments." N.T. Trial, 12/18/23, at 39. Members of the security department were "the only ones that were allowed in that unit to at least review videos." *Id*. For each security shift, there was a shift manager, assistant shift manager, and squads of security ambassadors with "several supervisors on each squad, depending on the time that they were working." *Id*. at 44. When Plaintiff was attacked, there were fourteen security ambassadors on duty and two supervisors, along with the manager and assistant manager. *Id*. at 45.

Mr. McKenna informed the jury that Defendant's security policies are in place to prevent theft, violence, and intoxication. *Id*. at 18-19. Intoxicated people are not allowed on the floor of the casino or in the bar areas. *Id*. at

20. Mr. McKenna conceded that the reason for this policy is "because intoxicated people do things that intoxicated people do," and must be prevented from harming themselves or other people. *Id*. at 19. Casino staff were trained to look for four signs of intoxication, namely staggering, swaying, alcohol on the breath, and slurred speech. *Id*. at 21-22, Exhibit 20. Visibly intoxicated patrons were to be reported to security and escorted out of the casino. *Id*. at 20.

Plaintiff presented Mr. McKenna with some of the available surveillance video showing Edwards walking in the casino before the attack. He testified that, from the preserved footage, he could not tell when Edwards arrived at the casino or whether she had been served alcohol while there. *Id*. at 25. Based on the fact that she was carrying a bag from one of the restaurants, Mr. McKenna acknowledged that Edwards had been at the casino long enough to have dinner. *Id*. at 26. He stated his belief that she was also in a bar, but he did not "know how much she had to drink or anything[.]" *Id*. at 25.

Considering images of what Plaintiff characterized as showing Edwards staggering and being held up by a man with whom she was walking, Mr. McKenna agreed that Edwards's "gait was slightly off," and that she was leaning on a companion who appeared to be "[e]scorting her." *Id*. at 24-26. He allowed that images of another woman who had been with Edwards's party, captured an hour after the incident, likewise showed atypical movement that might be indicative of intoxication. *Id*. at 81-82. However, Mr. McKenna

maintained that he could not determine merely from viewing the video whether the cause of their gaits was indeed intoxication. *Id*. at 81. He would need to further investigate to rule out medical issues such as cerebral palsy, muscular dystrophy, a diabetic attack, or a side effect of medication. *Id*. at 22, 83. Ultimately, Mr. McKenna agreed that a majority of the time, intoxication was the most likely cause. *Id*. at 83. His testimony concluded as follows:

> Q     . . . . And if this woman was intoxicated and she was walking around on the casino floor with these other women who were beating [Plaintiff], it was the casino's responsibility to prevent that from happening, wasn't it?
>
> A     Yes, we don't allow intoxicated individuals on the floor.

*Id*. at 84.

Mr. Shreckengost testified that Defendant has approximately 1,700 surveillance cameras that are watched by operators from stations in a cloistered section of the building. *See* N.T. Trial, 12/20/23, at 39, 42. These high-resolution cameras capture detailed images of patrons throughout the casino. *Id*. at 16-17. The purpose of this "eye in the sky" is to look for, and prevent, theft, violence, and public intoxication. *Id*. at 18. Mr. Shreckengost acknowledged that violence sometimes occurs at the casino, as he had "seen people come on the floor with guns[,] . . . seen people get stabbed at that casino[,]" and seen people get stabbed in the casino's parking lot. *Id*. at 18-19.

When questioned why all the images of Plaintiff and her assailants were not preserved as requested by counsel's May 10, 2022 letter, Mr. Shreckengost explained that all footage not selected to be saved is automatically overwritten after two weeks. *Id*. at 33-36. Defendant had saved some of the images that were produced to Plaintiff of its own accord, with a focus on the assailants at the time of the incident, and additional coverage based upon a request of the Pennsylvania State Police made the same week as the attack. *Id*. at 29, 45. As for video of Plaintiff being led through the casino afterwards, Mr. Shreckengost stated: "We preserve evidence of a suspect of a crime, not the victim." *Id*. at 29. Thus, the surveillance footage more broadly depicting the events of the night in question was overwritten before Defendant received Plaintiff's request.

Concerning video showing the assailants' activities within the casino in the hours leading up to the assault, the jury heard the following testimony from Mr. Shreckengost:

Q    Okay. So let me ask you this: You said you keep the video of the suspects?

A    Yes, that's saved.

Q    All right. So let me call you out on that. Put up [an in image of Edwards]. You ever seen her before?

A    She was one of the suspects detained in the fight.

Q    All right. So where is the video of her before the incident?

A    We didn't need it before the incident.

Q     Yesterday testimony was given that she was walking around intoxicated at the casino.

A     Okay.

Q     That would be important to keep because public intoxication is a crime; right?

A     It is.

Q     Okay. So[,] if she's walking around the casino publicly intoxicated, you should have that video?

A     We have the video of her entering the bathroom.

Q     Okay. But you don't have the video of her public intoxication?

A     I don't believe we do.

Q     You don't have the video of her sitting at a bar? Sean McKenna, do you know who Sean McKenna is?

A     I do know Sean McKenna.

Q     Yesterday he said she was sitting at the bar and that she was there for some time. Can you show the members of the jury, can you prove to them with your video evidence, your eyes in the sky, that she didn't have two, three, four, five, six, seven drinks?

A     No, we didn't preserve that.

Q     There was another young lady who had a black shirt and a heart, a white heart in the middle of her shirt. We have video of her stumbling and stammering. Do you have any video of her before the incident?

A     No, our video starts with the incident itself.

Q     So you don't know if she drank there or not?

A     I don't know.

Q She could have had seven cocktails there. You wouldn't be able to prove that she didn't because you got rid of the video?

A Again, we didn't get rid of any video. It overrides itself.

Q It overrides itself. But you don't keep it; right?

A If it's saved, it's saved forever. If we don't save it, it will override [*sic*] after a certain period of time.

Q If you had wanted to -- if you wanted to -- could you have kept the video of this young lady walking through the casino with no hair and three fractures in her face? Could you have kept that if you had wanted to?

A If we had wanted to?

Q Yeah.

A It's not a matter of if you want to. It's a matter of your standard of process.

Q My question to you is if you wanted to, could you have kept it?

A We can keep anything we want.

Q Bam. . . . No further questions.

***Id***. at 34-37.

After the close of evidence, the trial court instructed the jury as the elements of negligence, first generally defining the term as "failing to do something which a reasonably careful person would do or the doing of something which a reasonably careful person would not do in light of all of the surrounding circumstances established by the evidence in this case." ***Id***. at 121. Speaking to Defendant's duty, the court charged that "[a]n owner of

land is required to use reasonable care in the maintenance and use of the land and to protect invitees from foreseeable harm[,]" as well as "to inspect the premises and to discover dangerous conditions." *Id*. at 122. Regarding causation, the court explained that "[c]onduct is a factual cause of harm when the harm would not have occurred absent the conduct." *Id*. at 123. As for damages, the jury heard that a person whose harm was caused by the negligence of another is entitled to recover "an amount representing a fair and reasonable recovery" for three categories of noneconomic damages: (1) physical and emotional pain and suffering, (2) embarrassment and humiliation, and (3) loss of ability to enjoy life's pleasures. *Id*. at 126-28.

The court explained the verdict slip to the jury, highlighting that, while the jury had to determine whether Defendant was negligent, the answer to whether Edwards and Lowry were negligent had "been marked yes for you because the testimony was uncontradicted that they participated in the assault in this case." *Id*. at 120. If the jury determined that any party's negligence was a factual cause of harm to plaintiff, it was to proceed to allocate damages.

At Plaintiff's request, and over the objection of Defendant, the court also gave an adverse inference instruction as follows:

> In this case you heard that [D]efendant may not have produced certain videos during the trial. When a piece of evidence is within the control of one party in a lawsuit and would be relevant and helpful to that party and that party does not satisfactorily explain why it was not produced during the trial, you may find that the

evidence would have been unfavorable to that party if it had been produced during the trial.

*Id*. at 129-30.

After asking a question about how it was supposed to "interpret negligence" for Edwards and Lowry, prompting the court to repeat its general negligence charge without reference to the duties peculiar to landowners, the jury retuned a verdict in favor of Plaintiff. *Id*. at 140-44. Specifically, it deemed Defendant to be negligent along with Edwards and Lowry, found that only the negligence of Defendant and Edwards were factual causes of harm to Plaintiff, and attributed to Defendant 99% of the responsibility for Plaintiff's damages of $3 million. *Id*. at 143-44.

Plaintiff filed a post-trial motion for delay damages, while, pertinent to this appeal, Defendant timely moved for judgment notwithstanding the verdict ("JNOV"), a new trial, and remittitur. Its JNOV claim was premised upon Plaintiff's failure to proffer expert testimony to establish that it breached a legal duty owed to her or that any such breach caused her damages. Defendant's request for a new trial was founded upon, among other things, the purportedly improper introduction of evidence of Edwards's intoxication and the issuance of the adverse inference instruction. Finally, Defendant asserted that the $3 million verdict "was grossly excessive and unsupported by the evidence presented at trial." Defendant's Motion for Post-trial Relief, 12/29/23, at ¶ 77.

The trial court denied Defendant's motion, and it prematurely filed a notice of appeal before the court ruled upon Plaintiff's motion or judgment was entered on the verdict. Defendant then filed a *praecipe* to enter judgment on the verdict, again while Plaintiff's motion for delay damages remained outstanding. This Court vacated the judgment, quashed the premature appeal, and remanded for the trial court to dispose of Plaintiff's motion for delay damages. Thereafter, the trial court granted the same and, on October 2, 2023, judgment was entered against Defendant and Edwards in the amount of $3,071,958.90. Defendant filed the instant appeal from that judgment.

Along the way, the trial court had ordered Defendant to file a Pa.R.A.P. 1925(b) statement of errors complained of on appeal.[2] Defendant filed its statement and the court authored a responsive Rule 1925(a) opinion. Defendant presents the following questions for our consideration, which we have reordered for ease of discussion:

> 1. Can Plaintiff sustain a negligence claim against [Defendant] without presenting evidence that [Defendant] failed to exercise reasonable care in carrying out its security program, including removing intoxicated patrons?
>
> 2. Can Plaintiff sustain a negligence claim against [Defendant] without presenting evidence of any history of assaults in bathrooms or by intoxicated patrons at the casino that

_____

[2] We remind the trial court that all Rule 1925(b) orders must specify both where the appellant may serve the statement in person and the address where it may be mailed, as well as provide "that any issue not properly included in the Statement timely filed and served pursuant to subdivision (b) **shall** be deemed waived." Pa.R.A.P. 1925(b)(3) (emphasis added).

would have provided notice of a risk of assault on business invitees?

3.    Can Plaintiff sustain a negligence claim against [Defendant] without presenting evidence that her assault would not have occurred if [it] had provided additional security measures?

4.    Can Plaintiff sustain a negligence claim against [Defendant] without presenting expert testimony about the reasonableness of [its] implementation of its security program and whether Plaintiff's injuries were a result of any lack of reasonableness, where [Defendant]'s complex security program is beyond the ken of the ordinary layperson?

5.    Was evidence of Plaintiff's assailant's intoxication and consumption of alcohol at the casino irrelevant, unduly prejudicial, and inadmissible where it is not indicative of a propensity to violence?

6.    Where [Defendant] automatically overwrites video footage after fourteen days, Plaintiff offered no evidence [Defendant] had intentionally erased any footage, and the footage Plaintiff claims is missing is cumulative or irrelevant to her claims, was the trial court's decision to give an adverse inference instruction an abuse of discretion?

7.    Where none of Plaintiff's injuries required surgery or any treatment after five months, and she made no claim for the cost of treatment or care or lost wages, was the jury's $3 million damages award so excessive that a remittitur of the verdict is necessary?

Defendant's brief at 4-5 (some capitalization altered).

Defendant's first four issues assail the trial court's denial of its motion for JNOV by challenging the adequacy of Plaintiff's evidence to prove her negligence cause of action. JNOV is properly entered where:

one, the movant is entitled to judgment as a matter of law and/or two, the evidence is such that no two reasonable minds could disagree that the outcome should have been rendered in favor of

the movant. With the first, the court reviews the record and concludes that, even with all factual inferences decided adverse to the movant, the law nonetheless requires a verdict in his favor. Whereas with the second, the court reviews the evidentiary record and concludes that the evidence was such that a verdict for the movant was beyond peradventure.

*Kelly v. Carman Corp.*, 229 A.3d 634, 647 (Pa.Super. 2020) (cleaned up).

In considering whether either of these situations exists, we apply the same standard as the trial court. *Id*.

Defendant maintains that it is entitled to JNOV because Plaintiff failed to proffer sufficient evidence to establish that Defendant was negligent. This Court has summarized the elements of a negligence claim, and the respective roles of the court and jury, as follows:

The elements of a negligence-based cause of action are a duty, a breach of that duty, a causal relationship between the breach and the resulting injury, and actual loss. Negligence is carelessness; we define it as the absence of care under the circumstances. While the existence of a duty is a question of law, whether there has been a neglect of such duty is generally for the jury.

The deductive power of jurors is the lifeblood of the negligence test. A jury's sense of community mores and customs animates the legal figment by which negligence is measured – the so-called, reasonably prudent person. Jurors determine how a reasonably prudent person would act in given circumstances. As such, when the law of torts uses the terms "reasonable," "reasonableness," or "unreasonable," one should read those words to mean in the judgment of the jury.

The Supreme Court of Pennsylvania has long held that the jury may not be permitted to reach its verdict merely on the basis of speculation or conjecture, but that there must be evidence upon which logically its conclusion may be based. This does not mean that the jury may not draw inferences based upon all the evidence and the jurors' own knowledge and experiences, for that is, of course, the very heart of the jury's function. It also does not mean

- 15 -

that the jury's conclusion must be the only one which logically can be reached. The law only requires that the evidence presented must be such that by reasoning from it, without resort to prejudice or guess, a jury can reach the conclusion sought by plaintiff.

*Harris v. Felouzis*, 331 A.3d 919, 925–26 (Pa.Super. 2025) (cleaned up).

The legal duty owed to an invitee is stated in Restatement (Second) of Torts § 344, which provides:

A possessor of land who holds it open to the public for entry for his business purposes is subject to liability to members of the public while they are upon the land for such a purpose, for physical harm caused by the accidental, negligent, or intentionally harmful acts of third persons or animals, and by the failure of the possessor to exercise reasonable care to

(a) discover that such acts are being done or are likely to be done, or

(b) give a warning adequate to enable the visitors to avoid the harm, or otherwise to protect them against it.

Restatement (Second) of Torts § 344. The comments to § 344 make it plain that a business operator is not an absolute guarantor of the safety of its invitees, explaining:

Since the possessor is not an insurer of the visitor's safety, he is ordinarily under no duty to exercise any care until he knows or has reason to know that the acts of the third person are occurring, or are about to occur. He may, however, know or have reason to know, from past experience, that there is a likelihood of conduct on the part of third persons in general which is likely to endanger the safety of the visitor, even though he has no reason to expect it on the part of any particular individual. If the place or character of his business, or his past experience, is such that he should reasonably anticipate careless or criminal conduct on the part of third persons, either generally or at some particular time, he may be under a duty to take precautions against it, and to provide a reasonably sufficient number of servants to afford a reasonable protection.

- 16 -

*Id*. at cmt. f.

Even in the absence of a business's knowledge that third parties may pose a risk to invitees, our Supreme Court has recognized that the voluntary, gratuitous adoption of a program of protection, such as by employing "personnel specifically charged to patrol and protect the premises," gives rise to the expectation that they will "perform their duties with the usual reasonable care required under standard tort law for ordinary negligence." *Feld v. Merriam*, 485 A.2d 742, 747 (Pa. 1984) (discussing Restatement (Second) of Torts § 323). Where the security undertaking is not executed reasonably, and the negligence is a proximate cause of harm, liability attaches. *Id*. However, a beneficiary of the voluntary security "may not expect more than is offered." *Id*. The Court gave the following example:

> If, for instance, one guard is offered, he cannot expect the same quality and type of protection that two guards would have provided, nor may he expect the benefits that a different program might have provided. He can only expect the benefits reasonably expected of the program as offered and that that program will be conducted with reasonable care.

*Id*. *See also Newell v. Montana W., Inc.*, 154 A.3d 819, 838 (Pa.Super. 2017) ("[A] business that voluntarily offers its invitees services in addition to those that it has a legal duty to provide may be held liable for negligent provision of those services only to the extent of its voluntary undertaking[.]" (collecting cases)).

With these principles in mind, we turn to Defendant's arguments. It maintains that Plaintiff's evidence was inadequate to establish that it breached either a legally-imposed or a voluntarily-assumed duty to protect her from the third-party assault. In particular, Defendant asserts that it breached no duty pursuant to § 344 because Plaintiff offered no evidence of past violence in the restrooms such that it knew or should have known that Plaintiff was at risk. *See* Defendant's brief at 28-30. Defendant argues that the trial record failed to establish liability in accordance with § 323, since Defendant's voluntary program of security did not include monitoring the bathrooms by camera or personnel, and Plaintiff did not establish that any member of its personnel was aware that Edwards was intoxicated such that she should have been removed pursuant to casino policy. *Id*. at 23-25. Furthermore, Defendant contends that Plaintiff failed to prove, through necessary expert testimony, that there were reasonable security measures that it could have taken to prevent her injury, and its failure to do so is what caused Plaintiff's injuries. *Id*. at 30-37.

Defendant relies upon this Court's decision in ***Pearson v. Philadelphia Eagles, LLC***, 220 A.3d 1154 (Pa.Super. 2019), to advance its position regarding the absence of the breach of a duty owed to Plaintiff. In that case, Pearson attended an Eagles-Cowboys football game in Philadelphia wearing Cowboys paraphernalia. At halftime, while in line to use the urinals in the men's restroom, Eagles fans taunted the Cowboys supporters, and Pearson verbally responded. After a hometown fan removed Pearson's Cowboys cap

and threw it in the urinal prompting a scuffle, Pearson found himself on the floor surrounded by four or five men who held him down, twisted his leg, and choked him. The assailants fled before security arrived, having been summoned by one of the game attendants. Pearson later underwent multiple surgeries, having rods and pins placed in his leg, and had ongoing pain and a limp after completing physical therapy.

Pearson sued the Eagles and its stadium operator (collectively "Appellants") along with Apex, the company Appellants hired to provide security at stadium events, alleging that he was injured as result of their negligent provision of security. The jury awarded Pearson $700,000, finding him 20% responsible for his own injuries, and apportioning the remaining liability at 50% and 30% to Appellants and Apex, respectively. Appellants appealed to this Court, asserting that they were entitled to JNOV because Pearson did not prove the duty, breach, or causation elements of his negligence claim.

The **Pearson** Court considered the Restatement provisions discussed above, along with cases such as **Feld**, applying them. We observed that there was "no dispute that Pearson was a business invitee or that Appellants voluntarily undertook a duty protect its invitees from fighting during football games at [the stadium.]" **Pearson**, 220 A.3d at 1162. From this review, we ascertained that the first question was "whether Appellants had notice of prior incidents in the stadium bathrooms" such that § 344 liability was triggered,

and if not, whether Pearson "demonstrate[d] that Appellants otherwise lacked reasonable care in conducting their security program" to invoke liability in accordance with *Feld*. *Id*. at 1163.

Pearson avowed that he proved Appellants had the requisite notice because their security director and an Apex employee "both explicitly testified at trial that they were aware that fights had occurred in restrooms." *Id*. However, we found Pearson's assertions belied by the record. Those individuals had stated that violence in the restrooms was rare, with most incidents in that location involving intoxicated people who were so "overimpaired" that they required medical attention. *Id*. at 1165. Since altercations were uncommon occurrences in the restrooms, Appellants opted to deploy their security personnel strategically throughout the stadium seating 70,000 guests "where we kn[e]w the incidents are," which was "not inside the bathrooms." *Id*.

We discerned that this record failed to show that "Appellants knew or had reason to know, from past experience, that violent assaults were likely to occur in the restrooms that would endanger Appellants' invitees." *Id*. Consequently, "Appellants did not act unreasonably by not stationing security personnel in or directly outside the stadium restrooms[,]" and no § 344 liability was implicated. *Id*.

This Court further agreed with Appellants "that *Feld* precluded their liability for Pearson's injuries merely because they did not have security

personnel stationed in their restrooms, when the security program they had in place was otherwise adequate and Pearson presented no evidence that they operated it in a negligent manner." *Id*. at 1162. We were unpersuaded by Pearson's reference to the fact that it took several minutes for security to respond to his attack, stating that "there is no indication in the record or otherwise that[,] had the security personnel been more prompt in arriving at the restroom, it would have prevented Pearson's injury." *Id*.

We therefore held that the trial court erred in denying Appellants' motion for JNOV, concluding as follows:

> In sum, *Feld* instructs that property owners are liable to business invitees for harm caused by the foreseeable criminal actions of third parties only if the property owner agreed to undertake or voluntarily undertook a duty to provide such protection. In such situations, an invitee can only expect the benefits reasonably expected of the program as offered and that that program will be conducted with reasonable care. Where a property owner knows or has reason to know, from past experience, that there is a likelihood of conduct on the part of third persons that would harm invitees, the property owner may be under a duty to take precautions against it, and to provide a reasonably sufficient number of servants to afford a reasonable protection. In this case, however, the record does not support the trial court's conclusion that Appellants were on notice that violent assaults regularly took place in the stadium's restrooms or that Appellants conducted their security program without reasonable care.

*Id*. at 1166 (cleaned up).

Hence, Pearson's claim hinged upon the notion that Appellants had to expect that violence might spontaneously erupt in the stadium bathrooms such that their failure to have security monitor the bathrooms reflected the absence of due care. Defendant suggests that here, as in *Pearson*, Plaintiff's

claim was deficient because she proffered no history of assaults in the bathroom or proof "that it was unreasonable not to place cameras or security in the bathroom." Defendant's brief at 24.

However, as Plaintiff explained in her closing argument:

This is not about cameras in the bathroom, which is what they want to reduce the case to. It's about managing an environment and making sure that it's safe. . . .

. . . .

We know she was intoxicated and that's a problem for them. Two reasons. If she's drunk walking around on the casino floor, she was either drunk when she came in and they shouldn't have allowed her or she got drunk when she got there and they served her. Either way. This ain't about the bathroom. It's about the alcohol. It's about the 1,700 cameras. 1,700 cameras. It's about the 1,700 cameras that couldn't capture a woman in pink stumbling through the hallway drunk.

. . . .

. . . Either she was drunk when she got there -- they shouldn't have let her in -- or they served her to intoxication, which is a double whammy because you can't serve to intoxication and you can't let her walk around. But for her intoxication, this wouldn't be happening. But for their failure to follow their own policies, this wouldn't have happened.

N.T. Trial, 12/20/23, at 72, 75-76.

From this it is plain that Plaintiff's theory of negligence was significantly different from the injured party in **Pearson**. The security policy that the **Pearson** Appellants allegedly failed to enforce was the provision in the stadium's code of conduct that indicated staff would "proactively support an environment free from the following behaviors: . . . Fighting, taunting or

threatening remarks or gestures." ***Pearson***, 220 A.3d at 1162 n.2. While intoxication was also listed among the verboten behaviors, Pearson, unlike Plaintiff herein, did not contend that the patrons who assaulted him were visibly inebriated such that they should have been ejected for that reason prior to the bathroom fight.

In the case *sub judice*, as recounted in detail above, Defendant's directors of security and surveillance testified that: (1) it was Defendant's policy that intoxicated people were not allowed to be in the casino, as they were a threat to themselves and others; (2) staff were trained to look for signs of intoxication such as staggering, swaying, and slurred speech; and (3) Defendant utilized squads of security ambassadors and hundreds upon hundreds of high-quality cameras to monitor for intoxicated patrons to be removed by security. ***See*** N.T. Trial, 12/19/23, at 18-20; N.T. Trial, 12/20/23, at 16-19, 39-42.

The notion that Edwards had been visibly intoxicated before she assaulted Plaintiff was suggested by the preserved video footage, as well as Plaintiff's own testimony, that Edwards slurred her speech and walked with an unsteady gait prior to the assault. The jury was also permitted to infer that additional footage which could have established how obvious Edwards's impairment was, how long she exhibited it, and how many of Defendant's security and surveillance personnel failed to recognize it, was not preserved

because it would have been unfavorable to Defendant.[3]  Yet, despite Edwards's presence in the casino long enough before the attack to have dinner at a restaurant and sit at a bar, none of Defendant's employees took steps to enforce its policy to remove her from the casino.  Had they removed her, she would not have been in the bathroom to engage in the type of violence that was among the reasons for Defendant's decision to institute its policy.

Furthermore, since Plaintiff's case was not premised upon complex or sophisticated issues beyond the ken of laypersons, expert testimony was unnecessary to allow the jury to assess the reasonableness of Defendant's conduct.  Our decision in *Ovitsky v. Capital City Econ. Dev. Corp.*, 846 A.2d 124 (Pa.Super. 2004), authored by now-Chief Justice Todd, is instructive on this issue.  In that case, Ovitsky was a business invitee at a Ramada Inn. In the middle of the night, three men broke into his room and assaulted him. He sued the hotel contending that it had inadequate security personnel and equipment and failed to limit access to the premises.  The trial court granted the hotel's motion for summary judgment on the basis that Ovitsky failed to

---

[3] Defendant argues *infra* that the trial court improperly issued an adverse inference instruction and is entitled to a new trial on that basis.  Nonetheless, in reviewing the sufficiency of the evidence for purposes of the motion for JNOV, we evaluate all the evidence admitted at trial "the light most favorable to the verdict winner, giving the victorious party the benefit of every reasonable inference arising from the evidence and rejecting all unfavorable testimony and inferences."  *Coryell v. Morris*, 330 A.3d 1270, 1278 (Pa.Super. 2025) (cleaned up).

come forth with expert testimony to establish that the existing measures were inadequate or unreasonable.

This Court reversed, holding "that a jury would be capable, absent expert direction, to decide whether Ramada Inn took reasonable measures to provide for the safety of its guests, and specifically Ovitsky." *Id*. at 126. We discerned that "[s]taying in hotels is quite common and . . . such familiar experiences, along with common sense notions of safety and security, are sufficient to allow a jury to conclude whether Ramada Inn's security measures were reasonable." *Id*. Although we did not rule out the possibility that another case might require an expert, we found support for our ruling

> from decisions in other jurisdictions which conclude[d] that security expertise [wa]s not required or appropriate in such situations. *See*, *e.g.*, *Bethea v. Bristol Lodge Corp.*, 2002 WL 31859434, *8 (E.D.Pa. Dec.18, 2002) (concluding, in case alleging that adult business' failure to provide adequate lighting and security led to deadly attack, that "lay persons may determine any negligence based upon their own common sense and experience"); *Ortiz v. New York City Hous. Auth.*, 22 F.Supp.2d 15, 24 (E.D.N.Y.1998) (concluding that the consequences of the failure to maintain reasonable security in public housing complex, resulting in attack on resident, were within the understanding of the average juror and did not require expert testimony), *aff'd* 198 F.3d 234 (2d Cir.1999); *Fante v. Trump Taj Mahal Assoc., P'ship, Inc.*, 1996 WL 263652, *5 (N.J.Super.App.Div. 1996) (claims by woman trampled in casino allegedly due to poor crowd control and security were "easily understood, and an understanding of dangers specific to a crowded casino cannot be deemed an uncommon experience, especially for Atlantic County jurors"); *Van Blargan v. Williams Hospitality Corp.*, 754 F.Supp. 246, 249 (D.Puerto Rico 1991) (in case involving hotel guests attacked while on hotel patio, concluding that "hotel security is not a subject which lends itself to expert testimony" because "it deals with common occurrences

- 25 -

that the jurors have knowledge of through their experiences in everyday life").

*Id*. at 126-27. Therefore, we reversed and remanded for further proceedings.

Defendant argues that security concerns at a casino are more complex than in a hotel or store, and visiting a casino is not as common as patronizing one of those establishments, citing regulations imposed by the Pennsylvania Gaming Control Board. *See* Defendant's brief at 35-37. We are not persuaded. This is not a sophisticated matter involving improper dealing or some other issue unique to casino security. Indeed, one of the cases cited with approval by the *Ovitsky* Court that did not require expert testimony involved a woman being injured allegedly due to poor security at a casino. Rather, as the trial court aptly stated, "the jury was free to infer on their own without an expert that the deleted video would have shown that Edwards was very clearly intoxicated prior to the attack and that [Defendant] failed to do anything about it." Trial Court Opinion, 7/8/24, at 6.

In sum, the trial record was "such that by reasoning from it, without resort to prejudice or guess, [the] jury c[ould] reach the conclusion sought by plaintiff," namely that she was injured as a result of Defendant's failure to reasonably execute its security program, through "inferences based upon all the evidence and the jurors' own knowledge and experiences[.]" *Harris*, 331 A.3d at 925–26 (cleaned up). Therefore, we find that the trial court properly held that Defendant was not entitled to JNOV.

We now turn to Defendant's claims that it is entitled to a new trial. Initially we observe:

> Our standard of review when faced with an appeal from the trial court's denial of a motion for a new trial is whether the trial court clearly and palpably committed an error of law that controlled the outcome of the case or constituted an abuse of discretion. In examining the evidence in the light most favorable to the verdict winner, to reverse the trial court, we must conclude that the verdict would change if another trial were granted.

*Heffelfinger v. Shen*, 342 A.3d 711, 720 (Pa Super. 2025) (cleaned up).

Defendant first argues that it is entitled to a new trial due to the trial court's refusal to exclude evidence of Edwards's intoxication. We bear in mind that "[e]videntiary rulings are committed to the sound discretion of the trial court, and will not be overruled absent an abuse of discretion or error of law." *Hagans v. Hosp. of the Univ. of Pennsylvania*, 343 A.3d 251, 271 (Pa.Super. 2025) (cleaned up). "An abuse of discretion occurs where the trial court reaches a conclusion that overrides or misapplies the law, or where the judgment exercised is manifestly unreasonable, or is the result of partiality, prejudice, bias, or ill will." *Brady v. Urbas*, 111 A.3d 1155, 1161 (Pa. 2015) (cleaned up).

Defendant maintains that intoxication is not reflective of a propensity for violence, such that the evidence "was grossly irrelevant and prejudiced the jury, directly contributing to an unsupported liability finding and an outrageous damages award." Defendant's brief at 45.

The trial court addressed this claim of error as follows:

> [Plaintiff]'s main theory of liability against [Defendant] revolved around the argument that although [Defendant] had adopted a policy of removing intoxicated patrons from the premises, it allowed a visibly intoxicated Edwards to remain on the premises. Given that [Defendant]'s director of security testified that it was their policy to remove intoxicated patrons from the premises, then whether or not Edwards was visibly intoxicated before the incident was highly relevant to determine [Defendant]'s negligence.

Trial Court Opinion, 7/8/24, at 9.

We perceive no abuse of discretion in this analysis. On the contrary, the court's reasoning is manifestly sound. Plaintiff did not allege that Defendant knew or should have known that Edwards had a propensity for violence. She proceeded on the theory that Edwards would not have been in the bathroom to perpetrate violence upon her if Defendant reasonably executed its voluntary security program that prohibited intoxicated people from remaining in the casino. Furthermore, she contended that it was reasonably foreseeable that this type of harm might result from allowing intoxicated patrons to roam the facility, and that this was established by Defendant's security director, Mr. McKenna, who testified that "intoxicated people do things that intoxicated people do," and must be prevented from harming themselves or other people. *See* N.T. Trial, 12/19/23, at 19. No relief is due.

Defendant next assails the trial court's decision to give an adverse inference instruction concerning the unpreserved video footage. The following guides our consideration of this issue:

Our Supreme Court defined spoliation of evidence . . . as the non-preservation or significant alteration of evidence for pending or future litigation, and authorized "trial courts to exercise their discretion to impose a range of sanctions against the spoliator. The doctrine applies where relevant evidence has been lost or destroyed. Where a party destroys or loses proof that is pertinent to a lawsuit, a court may impose a variety of sanctions, among them entry of judgment against the offending party, exclusion of evidence, monetary penalties such as fines and attorney fees, and adverse inference instructions to the jury.

. . . The doctrine attempts to compensate those whose legal rights are impaired by the destruction of evidence by creating an adverse inference against the party responsible for the destruction. When we review the propriety of a sanction, we must determine whether the court abused its discretion.

The duty to retain evidence is established where a party knows that litigation is pending or likely and it is foreseeable that discarding the evidence would be prejudicial to the other party. Where spoliation has occurred, the trial court must weigh three factors in assessing the proper penalty: (1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party and, where the offending party is seriously at fault, will serve to deter such conduct by others in the future.

*Marshall v. Brown's IA, LLC*, 213 A.3d 263, 267–68 (Pa.Super. 2019) (cleaned up).

Defendant argues that the adverse inference instruction was not warranted here because it took no affirmative act to destroy the evidence in question and acted in good faith when it, after saving the footage requested by police and receiving no other preservation request within two weeks, allowing the surveillance video to be overwritten in accordance with its policy. *See* Defendant's brief at 53-55. Defendant cites Mr. Shreckengost's

explanation that retaining footage from all 1,700 surveillance cameras was simply not feasible as its justification for the failure to preserve the evidence, and maintains that it had no reason to foresee that Plaintiff would be prejudiced, given her failure to demand its preservation within two weeks. *Id*. at 55. Defendant further contends that Plaintiff failed to show that she had been prejudiced, asserting that she "was able to argue from the preserved CCTV footage presented at trial and other evidence that Edwards ate at the Casino, and her gait showed visible intoxication," and that Plaintiff's photographs sufficiently depicted her injuries. *Id*. at 57-58.

Defendant has again failed to persuade us that the trial court's decision misapplied the law, "[wa]s manifestly unreasonable, or [wa]s the result of partiality, prejudice, bias, or ill will." ***Brady***, 111 A.3d at 1161 (cleaned up). As recounted in addressing Defendant's JNOV arguments, it took the position that Plaintiff's claim must fail because she did not show Defendant's awareness of the fact that Edwards was intoxicated such that she should have been removed pursuant to casino policy. ***See*** Defendant's brief at 25. Yet, the evidence that "would have shown how long the assailants had been at the casino, how much alcohol they had consumed, and how long they had appeared visibly intoxicated," *i.e.*, would have demonstrated whether Defendant knew or should have known that Edwards's presence was in violation of its security policy, was precisely what Defendant elected not to preserve. ***See*** Trial Court Opinion, 7/8/24, at 13.

Additionally, Defendant's receipt of the prompt notice to preserve the evidence twenty-three days after the incident was not its first indication that litigation was likely. Plaintiff herself made efforts to contact the security management in the days following the assault, albeit without specifically requesting preservation of evidence. *See* N.T. Trial, 12/18/23, at 102-04. Also, Mr. Shreckengost testified that Defendant had the capability to preserve additional footage from that night, and the cost to do so was negligible. *See* N.T. Trial, 12/20/23, at 37, 47.

Moreover, in giving an adverse inference instruction, the court imposed "the least severe spoliation sanction[.]" *Marshall*, 213 A.3d at 273. Plaintiff aptly highlights that "the instruction did not compel the jury to reach any particular conclusion." Plaintiff's brief at 40. Instead:

> The jury was instructed to determine whether they were satisfied by [Defendant]'s explanation as to why certain footage was preserved and other footage that would have been relevant and helpful to [Plaintiff] was not. If they were not satisfied, they were properly permitted to find that the missing video footage would have been unfavorable to Appellant.

Trial Court Opinion, 7/8/24, at 13. Stated differently, if the jury was satisfied with Defendant's explanation, it was at liberty to decline to make any adverse inferences.

Presented with these circumstances and the trial court's reasonable account of its decision, we have no cause to find an abuse of discretion. *Accord Marshall*, 213 A.3d at 273 (granting new trial to plaintiff based upon trial court's refusal to give adverse inference instruction where store kept only

a fraction of video surrounding the plaintiff's injury, "the deleted video footage was probative evidence of the condition of the premises prior to [her] fall, as well as [the business's] due care, or lack of it, in keeping its premises safe for invitees[,]" and "[s]imilar evidence could not be obtained from any other source"). Defendant's jury instruction challenge merits no relief.

Finally, Defendant asserts that the trial court wrongfully denied its motion for remittitur. The following legal principles guide our review:

> [O]ur standard of review from the denial of a remittitur is circumspect and judicial reduction of a jury award is appropriate only when the award is plainly excessive and exorbitant. The question is whether the award of damages falls within the uncertain limits of fair and reasonable compensation or whether the verdict so shocks the sense of justice as to suggest that the jury was influenced by partiality, prejudice, mistake, or corruption. Furthermore, the decision to grant or deny remittitur is within the sole discretion of the trial court, and proper appellate review dictates this Court reverse such an order only if the trial court abused its discretion or committed an error of law in evaluating a party's request for remittitur.
>
> With respect to compensatory damages, this Court will not find a verdict excessive unless it is so grossly excessive as to shock our sense of justice. A court may consider: (1) the severity of the injury; (2) whether the plaintiff's injury is manifested by objective physical evidence or whether it is only revealed by the subjective testimony of the plaintiff; (3) whether the injury will affect the plaintiff permanently; (4) whether the plaintiff can continue with his or her employment; (5) the size of the plaintiff's out-of-pocket expenses; and (6) the amount plaintiff demanded in the original complaint.

**Heffelfinger**, 342 A.3d at 724 (cleaned up).

Here, Plaintiff did not offer proof of economic damages, and in her complaint demanded an amount in excess of the arbitration threshold. In

arguing the remaining factors governing remittitur, Defendant briefly acknowledges that Plaintiff had "some objective evidence of injury" but focuses upon a representation that she had "no need for future treatment and reported minor pain, now resolved." Defendant's brief at 38. Defendant later in its brief correctly recounts that Plaintiff testified to ongoing pain, but deems it minor and insignificant. *Id*. at 41. Defendant further advocates for remittitur by analogy to by *Hartner v. Home Depot USA, Inc.*, 836 A.2d 924 (Pa.Super. 2003), a case involving a woman who was awarded nearly $1 million twenty-five years ago after she injured her knee falling in a parking lot, and *Smalls v. Pittsburgh-Corning Corp.*, 843 A.2d 410 (Pa.Super. 2004), in which a jury, also a quarter century ago, awarded $2 million for a non-malignant asbestos disease to "a sedentary, seventy-four-year-old man with cirrhosis and a twenty-year smoking habit [whose only complaints were that he] became winded after moderate exercise and no longer was as active around the house as he once was." *Id*. at 417.

Our review of the record reveals that Defendant's argument inconsistently, selectively, and inaccurately recounts the evidence of Plaintiff's injuries. First, in addition to her visible swollen black eye, lacerations to her nose and mouth, and torn out hair, the "some objective evidence of injury" cursorily referenced by Defendant was MRI and CT images reflecting that Plaintiff sustained fractures to her nasal bones and the bones surrounding her eye, along with permanent disc herniations in her neck and back. *See* N.T.

Deposition of Mark Allen M.D., 12/1/23, at 15-31, 36, 44. Plaintiff achieved her maximum medical improvement from physical therapy, but her spinal injuries and the resultant pain not only failed to resolve, but are expected to progress during the remainder of her life expectancy of approximately forty years. *Id*. at 41; N.T. Trial, 12/20/23, at 128.

Furthermore, Plaintiff was entitled to recover not only for the pain and suffering caused by her physical injuries, which is arguably comparable to the type of damages at issue in *Hartner* and *Smalls*, but also for the emotional trauma, embarrassment, and humiliation to which she, unlike the *Hartner* and *Smalls* plaintiffs, was subjected as a result of Defendant's negligence. Plaintiff was "forced to the filthy ground filled with urine[,]" punched, kicked, and robbed of her hair. *See* N.T. Trial, 12/18/23, at 89-94. Defendant's staff then marched her through the gaming floor for all to see rather than discreetly showing her to her car, leaving her "[e]mbarrassed, humiliated[, a]nd just totally degraded." *Id*. at 106. The experience left Plaintiff feeling uncomfortable outside the safety of her home, reluctant to go out to do day-to-day activities, and fearful of being assaulted again. *Id*. at 118.

Having presided over the trial and observed the evidence first-hand, the trial court opined:

> It was up to the jurors to decide appropriate compensation for these types of non-economic damages. While $3 million is certainly a very substantial award, the court cannot say it shocks the conscience, nor has there been any evidence suggesting partiality, prejudice, mistake, or corruption on the part of the jury.

Trial Court Opinion, 7/8/24, at 6 (cleaned up). We discern no abuse of discretion in this ruling.

In sum, as we conclude that Plaintiff's trial evidence was sufficient to prove the elements of her cause of action to recover for Defendant's negligence, we decline to reverse the trial court's denial of JNOV. Nor has Defendant convinced us that the trial court abused its discretion in refusing to grant Defendant a new trial or remittitur. Therefore, we affirm the judgment.

Judgment affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 2/24/2026